[891 NYS2d 41]

James Acevedo et al., Plaintiffs, and Steve Rosenthal, Respondent, v The Piano Building LLC, Appellant, et al., Defendant.

First Department, December 10, 2009

APPEARANCES OF COUNSEL

*Heiberger & Associates, P.C.*, New York City (*Maxwell Breed* and *Lawrence C. McCourt* of counsel), for appellant.

*Himmelstein McConnell Gribben Donoghue & Joseph*, New York City (*David E. Frazer* of counsel), for respondent.

## OPINION OF THE COURT

RENWICK, J.

In this landlord-tenant dispute, we revisit the issue of whether an apartment covered by the Loft Law may revert to rent stabilization after the landlord purchased the prior occupant's rights under Multiple Dwelling Law § 286 (12) in a pre-1974 building containing six or more residential units. The landlord invites us to overrule our 2002 pronouncement in *182 Fifth Ave. v Design Dev. Concepts* (300 AD2d 198 [2002]) in which we answered the question in the affirmative. The owner relies primarily upon *Wolinsky v Kee Yip Realty Corp.* (2 NY3d 487 [2004]), which the Second Department has interpreted broadly as barring Emergency Tenant Protection Act of 1974 ([ETPA] L 1974, ch 576, § 4, as amended)[1] coverage to all loft units not subject to the Loft Law, even where the New York City Zoning Resolution permits residential use as of right. We decline to follow the Second Department, as we find *Wolinsky* consistent with our view on this issue.

The essential facts are undisputed. The unit that is the subject of this action is a loft apartment (unit 14C) at 115 West 23rd Street in Manhattan. When the former owner purchased the

---

1. ETPA provides for the regulation of all housing accommodations it does not expressly except, including previously unregulated accommodations (McKinney's Uncons Laws of NY §§ 8623, 8625 [ETPA §§ 3, 5]). Buildings containing fewer than six units are expressly excepted (Uncons Laws § 8625 [a] [4] [a]).

commercial building in December 1977, Keith Christensen held a residential lease for the unit. In 1985, the Loft Board ruled that seven of the building's units, including Christensen's apartment, constituted an interim multiple dwelling (IMD) and that his unit was covered under the Loft Law (Multiple Dwelling Law art 7-C).[2] The apartment thus became subject to rent regulation.

In December 1995, the former owner purchased the tenant's rights under the Loft Law pursuant to Multiple Dwelling Law § 286 (12). The Loft Board sales record form indicates that the unit would not be converted to nonresidential use. In the space asking whether the unit is "subject to rent regulation under any other law, rule or regulation," the response is that it was an IMD and "is now registered with DHCR." The buyout agreement states that the Christensens, as occupants of the unit vacated, "were and are covered under article 7C of the Multiple Dwelling Law or the Rent Stabilization Laws."[3] By the time of this transaction, the prior owner had already obtained a certificate of occupancy for residential use of the premises. In addition, the certificate of occupancy indicates that the building contains 18 residential units. The owner kept the unit as a residential rental.

In June 1999, plaintiff Rosenthal began to occupy unit 14C pursuant to a residential lease. From its inception, the prior owner treated Rosenthal as an unregulated market rent tenant, with monthly rent starting at $2,781.[4] In April 2005, Rosenthal and others[5] commenced this action to declare their units subject to rent stabilization under ETPA and to recover rent overcharges. The owner asserted in its answer that since the prior owner had purchased the Loft Law rights from the tenant's predecessor, the unit is not subject to ETPA. Where there is a sale of rights pursuant to the Loft Law, the owner argued, the unit is permanently deregulated. On the other hand, the tenant

---

2. The Loft Law permits conversion of IMDs, which are defined as any building once used for commercial, manufacturing, or warehouse purposes and that lacks a residential certificate of occupancy (Multiple Dwelling Law § 281 [1]). The Loft Law is generally limited to buildings that, on December 1, 1981, had been occupied for residential purposes by three or more families living independently of each other since April 1, 1980 (id).

3. At the time, Christensen apparently was married.

4. The most recent monthly rent charged by the landlord was $3,201.14.

5. Numerous other similarly situated residential tenants were part of this litigation but settled their respective claims against the owner during different stages of this action.

maintained that residential use of the unit triggered rent stabilization protection under ETPA for pre-1974 buildings with six or more residential units.

Following discovery, the tenant and the landlord each moved for summary judgment on the foregoing defense. The court granted the tenant's motion and denied the owner's cross motion, relying primarily upon our decision in *182 Fifth Ave. v Design Dev. Concepts*. The owner now appeals.

We reject the owner's assertion that the sale of the Loft Law rights here ended the unit's eligibility for rent stabilization. In *182 Fifth Ave.*, this Court confronted a circumstance identical to this one: the owner of a loft covered by the Loft Law purchased the protected occupant's rights under Multiple Dwelling Law § 286 (12) and then leased the unit for residential purposes. We held that where, as here, the building contains six or more residential units, it is subject to rent stabilization by virtue of ETPA "notwithstanding the sale of Loft Law rights by a prior tenant" (300 AD2d at 199; *see also Matter of 315 Berry St. Corp. v Hanson Fine Arts*, 39 AD3d 656 [2007], *lv dismissed* 10 NY3d 742 [2008]).

The result in *182 Fifth Ave.* and its progeny is amply supported by the plain language of Multiple Dwelling Law § 286 (12), which reads as follows:

> "No waiver of rights pursuant to this article by a residential occupant qualified for protection pursuant to this article made prior to the effective date of the act which added this article shall be accorded any force or effect; however, subsequent to the effective date an owner and a residential occupant may agree to the purchase by the owner of *such person's rights in a unit*" (emphasis added).

By its own terms, Multiple Dwelling Law § 286 (12) applies only to the purchase of an occupant's Loft Law rights. The statute says nothing about rent stabilization or ETPA; it says nothing about any subsequent tenant's rights; indeed, it says nothing about deregulating units in any way whatsoever. The purchase of rights permitted in this section is thus necessarily limited to an occupant's rights under the Loft Law.

This conclusion is bolstered by the Loft Board's own regulations, which contemplate that units formerly covered by the Loft Law may be subject to rent stabilization even after they have been "deregulated" under the Loft Law. These regulations provide that an owner has two options after a sale of rights

under Multiple Dwelling Law § 286 (12). First, the owner may return the unit to its lawful commercial use, in which event the owner must file a certificate with the Loft Board and submit to a Loft Board inspection to confirm that all residential fixtures have been removed (29 RCNY 2-10 [c] [1]). The owner here does not claim to have availed itself of this option. Indeed, it issued the tenant a residential lease.

Under the regulation, the second option offered by the Loft Law upon a sale pursuant to Multiple Dwelling Law § 286 (12) is to continue residential use, except that the owner must legalize the unit under the Loft Law and it may remain subject to rent regulation (29 RCNY 2-10 [c] [2]):

> "Residential use. If the unit is to remain residential, the owner remains subject to all the requirements of Article 7-C, and regulations and orders of the Board, including the legalization requirements of Multiple Dwelling Law § 284, except that the unit is no longer subject to rent regulation where coverage under Article 7-C was the sole basis for such rent regulation, provided that there is no finding by the Loft Board of harassment as to any occupant(s) of the unit which has not been terminated pursuant to § 2-02 (d) (2) of the Board's Harassment Regulations. During the period of its IMD status, the IMD unit may be converted to non-residential use, as set forth in § 2-10 (c) (1) of these regulations, except that a harassment finding made after a sale shall not bar conversion of the unit to non-residential use."

The only other "such rent regulation" is ETPA. The Loft Board thus acknowledges that a former Loft Law unit may be covered by rent stabilization. If there were no other basis for regulation, such as ETPA, there would have been no reason for the phrase in the regulation referring to "the sole basis for such rent regulation."

To hold otherwise would negate the intent of the Loft Law, which was not to supplant rent regulation. Indeed, at the time of passage of the Loft Law, lofts that met statutory requirements were covered by the rent regulations, and this was not altered by the Legislature in passing the Loft Law or the amendment to ETPA (*see Mandel v Pitkowsky*, 102 Misc 2d 478 [App Term 1979], *affd* 76 AD2d 807 [1980]). Instead, the purpose of the Loft Law was to integrate unregulated loft dwelling units

into the coverage of the rent stabilization system, and to harmonize with—rather than displace—existing forms of regulation (*see Blackgold Realty Corp. v Milne*, 119 AD2d 512, 516 [1986], *affd* 69 NY2d 719 [1987]).

Realizing that tenants in such buildings would suffer a great hardship if forced to relocate, the Legislature enacted the Loft Law to allow residential tenants who had moved into nonresidential loft buildings in New York City prior to 1981 to remain in their units while landlords performed the work necessary to legalize the buildings for residential use, within specifically prescribed time periods, culminating in obtaining a certificate of occupancy as a class A multiple dwelling for the residential portions of the building or structure.[6] When a unit comes out of the Loft Law, it then goes into rent stabilization if it is otherwise covered. In contrast here, by maintaining the residential use of the unit and claiming exemption from regulation, rather than converting it to nonresidential use as contemplated by 29 RCNY 2-10 (c)—pursuant to which "the owner is relieved of its obligations to comply with the requirements of Article 7-C"—the owner's construction of the law to exempt it from rent regulation requirements would appear to subvert the very intention of the Loft Law to promote residential legalization.

The owner's reliance on *Wolinsky v Kee Yip Realty Corp.* is misplaced. There, the tenants did not seek protection under the Loft Law since they had illegally converted their commercially leased units, at their own expense, over a decade after the Loft Law's eligibility period ended. In addition, the building in question did not have a residential certificate of occupancy and the applicable zoning did not permit residential use. The tenants sought a declaration that "notwithstanding their illegal use of the space, they [we]re protected by the Rent Stabilization Law and Rent Stabilization Code through the ETPA" (2 NY3d at 490). The *Wolinsky* Court found that reading the Loft Law and ETPA together, the "tenants' illegal conversions do not fall under the ambit of the ETPA," noting that if the previously enacted ETPA "already protected illegal residential conversions of manufacturing space, significant portions of the Loft Law would have been unnecessary" (*id.* at 493).

---

**6.** The Loft Law established a mechanism for the procurement of a residential certificate of occupancy, during which time the loft tenants were covered by rent regulation pursuant to section 286 of the Multiple Dwelling Law and the Loft Board regulations. Once a residential certificate of occupancy was obtained, the tenancy became rent stabilized under the auspices of the New York State Division of Housing and Community Renewal.

We decline to join the Second Department (*see e.g. Caldwell v American Package Co., Inc.*, 57 AD3d 15 [2008]; *Gloveman Realty Corp. v Jefferys*, 18 AD3d 812 [2005]) in reading *Wolinsky* as providing a blanket prohibition barring ETPA coverage of all loft units not subject to the Loft Law, even where the Zoning Resolution permits residential use as of right. In our view, *Wolinsky* stands for nothing more than the proposition that illegal loft units are not entitled to rent stabilization treatment when the unit is incapable of being legalized. Indeed, the Court of Appeals acknowledged in *Wolinsky* the possibility that ETPA could provide protection to such tenancies capable of becoming legalized. It explicitly noted that the City of New York in that case had "not acted to amend the Zoning Resolution to include purely residential use . . . or to rezone tenants' neighborhood . . . Such steps could make residential loft units like tenants' legal or capable of being legalized" (2 NY3d at 493).

Significantly, focusing on *Wolinsky*'s statement quoted immediately above, this Court has held that rent stabilization under ETPA may apply to a loft unit otherwise not covered by the Loft Law where the unit is capable of legalization (*see 142 Fulton LLC v Hegarty*, 41 AD3d 286, 288 [2007]; *Duane Thomas LLC v Wallin*, 35 AD3d 232 [2006]; *see also Matter of 315 Berry St. Corp.*, 39 AD3d at 657). For instance, in *Duane Thomas*, this Court affirmed Supreme Court's declaration that a loft unit not covered by the Loft Law was still covered by rent stabilization, holding (35 AD3d at 233):

> "Although tenant commenced occupancy in 1991, after the Loft Law window period had closed without the subject unit having been registered with the Loft Board, the applicable Zoning Resolution (Tribeca Mixed Use District) permits residential use of 'loft dwellings,' which the subject building admittedly is, and does not expressly require that such dwellings be covered by the Loft Law. In fact, a temporary residential certificate of occupancy covering the unit was obtained by landlord in 2002, in accordance with the parties' 2001 agreement. It therefore appears that the unit is capable of being legalized, and may therefore be subject to rent stabilization." (Citation omitted.)

As the foregoing analysis illustrates, nothing in *Wolinsky* compels us to overrule our holding in *182 Fifth Ave.*, which is dispositive of the issue here. Where zoning expressly allows res-

idential use as of right, and apartments can be legalized by the owner filing a certificate of occupancy, there is no rationale under *Wolinsky* to foreclose ETPA coverage. To do so would be to deny effect to that part of *Wolinsky* that relied upon the impossibility of conforming with the Zoning Resolution as its basis for denying ETPA coverage. We thus adhere to our prior determination that where, as here, the pre-1974 building contains six or more residential units, it is subject to rent stabilization by virtue of ETPA "notwithstanding the sale of Loft Law rights by a prior tenant."

Accordingly, the order and judgment (one paper) of Supreme Court, New York County (Marcy S. Friedman, J.), entered June 19, 2008, which, inter alia, granted plaintiff Rosenthal's motion for summary judgment and declared his unit subject to rent stabilization pursuant to the Emergency Tenant Protection Act of 1974, should be affirmed, without costs.

MAZZARELLI, J.P., ANDRIAS, MOSKOWITZ and RICHTER, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered June 19, 2008, affirmed, without costs.